19338

The STATE, Respondent, v. J. L. MIKELL and Joe "Fats" Brown, Appellants

(185 S. E. (2d) 814)

*Messrs. Klyde Robinson* and *Geddes H. Martin, of Robinson, Paul and Belk,* Charleston Heights, *for Appellant Mikell* and *Falcon B. Hawkins* and *George J. Morris, of Hollings and Hawkins,* Charleston, *for Appellant Brown,* cite:

*A. Arthur Rosenblum, Esq. Asst. Sol.,* of Charleston, for *Respondent,* cites:

December 28, 1971.

LITTLEJOHN, Justice.

On March 4, 1970, the appellants, J. L. Mikell and Joe "Fats" Brown, were first indicted by the grand jury and then arrested for conspiracy to obstruct justice and attempt bribery from early January to March 4. They were tried jointly and convicted by a jury in the Court of General Sessions for Charleston County on June 5, of the same year. Each has appealed his conviction and asks for a new trial.

The facts leading up to the action of the grand jury in indicting Mikell and Brown are as follows:

Arnold Venning, son of James Venning, was charged in the Court of General Sessions with the criminal offense of receiving stolen goods. When James Venning learned that his son was charged, he talked with his acquaintance of long standing, defendant Brown, who operated a clothing store in Charleston. Brown suggested that defendant Mikell, who was a county detective, might assist Venning and his son with the case.

About January 7 or 8, 1970, James Venning, Brown and Mikell met and discussed young Venning's case. Mikell told Venning that he was "gonna see the man" for him, referring to Solicitor Robert Wallace. About January 26, 1970, Venning went to see Brown and asked Brown to get in touch with Mikell. At that time Brown told Venning that he (Venning) owed him $50 because he (Brown) had given Mikell $50 to take to Wallace. On the following day Mikell, Brown and Venning met and Mikell told Venning that he would require $2500 to get his son out of trouble. Later on the same day Venning borrowed $480 from a finance company and paid $300 of it to Mikell.

The day after paying the $300, Venning went to Solicitor Wallace's office and suggested to Wallace "that $2500 is a little steep", and told Wallace he could not afford that much money to settle the boy's case. Wallace, being unaware of

what had taken place, expressed surprise and Venning left. Later in the day, at Solicitor Wallace's direction, Venning was taken into custody by two agents of the South Carolina Law Enforcement Division (SLED) and brought to Wallace's private office. They discussed the arrangement Venning had made with Mikell, and Venning told them of having paid Mikell $300 which Mikell was supposed to pay to Wallace.

On January 28 Solicitor Wallace granted immunity to Venning upon the agreement that he would cooperate in seeking evidence against Mikell and Brown. Accordingly, James Venning has not been charged or indicted.

Upon instruction from the SLED agents, Venning went to talk with Brown on February 11, and using a small concealed tape recorder, recorded the conversation. On the following day he contacted and talked with Mikell and recorded that conversation also. The tapes were delivered to SLED agents.

On January 30 Mikell went to the office of Franklin West, who is special investigator for the solicitor's office, and discussed Arnold Venning's case. He told West that he "was interested in trying to help Arnold Venning." He inquired about the possibility of Arnold Venning turning State's evidence in exchange for some favorable consideration. West quoted Mikell as saying that he could get a statement from Arnold Venning. Mikell said he would contact West later and let him know about the statement and would also find out what Wallace said.

On February 12 Mikell phoned West to inquire about the propriety of his procuring the statement from Arnold Venning inasmuch as the city was handling the case and he (Mikell) was a county officer. He was instructed to proceed to take the statement.

On February 25 Mikell informed West on the phone that he had taken the statement and that he would bring it to him within a few hours. When Mikell came to West's office

to bring the statement West recorded the conversation, unbeknown to Mikell.

When the case was called for trial, counsel for the defendants sought a continuance on the ground that the three tape recordings and notes made by agents for the State, and/or by James Venning, had not been supplied them. The motion was denied and such ruling is a basis of one of appellants' exceptions. It is argued that the defendants were denied a fair trial because the tape recordings were not duplicated and given to the defendants. At the same time, counsel frankly admit in their brief that there is no broad right of discovery in criminal cases, and admit that generally the prosecution has no duty to inform the accused in advance of trial what the proof will be. See *State v. Flood,* S. C. 184 S. E. (2d) 549 filed in this court November 3, 1971.

We are of the opinion that the office of the solicitor was generous in sharing the information which it had prior to the trial. Mikell knew what was on the Venning-Mikell tape and what was on the West-Mikell tape because the recording was of his own conversation. Brown knew what was on the Venning-Brown tape because the recording was of his own conversation. In addition, the tapes were made available to the defense and played for them one week prior to the trial.

Prior to trial it was agreed that defense counsel could talk to Solicitor Wallace, who would be a witness, and to Investigator West, who would also be a witness. In addition, counsel for the defendants talked with co-conspirator Venning (not indicted) on May 13, and took a detailed unsigned statement from him. Under these facts there was no such thing as surprising these two defendants with proof. There is no showing that anything was withheld and no showing of prejudice. We are convinced that there was no legal basis for a continuance, and convinced that the judge did not abuse his discretion. The exception is without merit.

Counsel alleges error on the part of the trial judge in refusing the defendants' motion for continuance on the ground that the case was being called for trial out of its regular order on the docket, there being at least 70 cases which were older. We hold that the solicitor has authority to call cases in such order and in such manner as will facilitate the efficient administration of his official duties, subject to the overall broad supervision of the trial judge. If a defendant feels that his rights are prejudiced by reason of the calling of his case at any particular time, he may apply to the judge for a continuance beyond the term or for postponement to a date later within the term. In the calling of cases for trial the solicitor has a broad discretion in the first instance, and the trail judge has a broad discretion in the final analysis. A prosecuting attorney normally has many cases for disposition. He must plan ahead to expedite the work of the court, and should the day come when he is required to call cases in the order entered on the docket, the administration of justice will bog down. No legal cause has been shown for the granting of the motion, and certainly there is no abuse of discretion. There was no error.

Prior to trial, and during the trial, appellants sought to suppress the three tape recordings of conversations: 1—between Venning and Brown; 2—between Venning and Mikell; and 3—between West and Mikell. The trial judge refused the motions to suppress and the tapes, after being properly identified, were played for the benefit of the jury.

The question we are called upon to answer is: were the tape recordings properly admitted into evidence? In arguing that the trial judge erred, counsel for the defendants submit several arguments. They say that the recordings were made after the defendants became prime suspects without being warned of their constitutional right to remain silent and to have counsel. They argue that the tapes were made after Venning abandoned his part in the conspiracy (on January 28) and after the conspiracy terminated. They assert that Mikell's counsel had no opportunity to cross examine Brown

relative to statements Brown made on the tape about Mikell, and that Brown's counsel had no opportunity to cross examine Mikell about statements Mikell made on the tape about Brown (neither Brown nor Mikell testified). Finally, they maintain that Sections 1-65 and 26-7.1 of the 1962 Code require that a duplicate copy of a tape be given to a defendant the same as a duplicate copy of a written statement.

There is no question but that the three tape recordings were made at the bequest of the solicitor's office. It is certain that the solicitor granted immunity to co-conspirator Venning on January 28, and after that date he was no longer a party to the unlawful scheme. Brown and Mikell did not know of Venning's withdrawal until they were indicted on March 4; prior to March 4 they were not advised of their right to remain silent or to have counsel. Even though they were suspects, they were not charged and had not been arrested. The state was continuing its investigation and accumulating evidence, which it had the right to do.

Counsel for the defendants candidly concede that this point has been decided adversely to the position they take in the case of *Hoffa v. United States,* 385 U. S. 293, 87 S. Ct. 408, 17 L. Ed. (2d) 374 (1966), wherein the Supreme Court of the United States said:

"There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation at the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."

The position of the appellants cannot be sustained.

324

In the law of conspiracy it is a well recognized exception to the hearsay rule that statements of one conspirator made while the conspiracy is pending, are admissible against co-conspirator; once *prima facie* evidence of a conspiracy is shown by the state, the acts and declarations of any conspirator made during the pendency of the conspiracy and in furtherance thereof are deemed to be the acts and declarations of every other conspirator, and are therefore admissible against all. *State v. Ferguson,* 221 S. C. 300, 70 S. E. (2d) 355 (1952).

It is also evidentiary law that acts and declarations of a co-conspirator made after the conspiracy has terminated, are not admissible against other co-conspirators.

It is important to determine whether the conspiracy continued to exist after January 28, when Venning withdrew. We are of the opinion that it continued until the time of the indictment on March 4 insofar as Mikell and Brown were concerned. Even though Venning was no longer a party to the conspiracy after January 28 there is nothing in the record to support an inference that either Mikell or Brown abandoned their common design. A conspiracy continues so long as there are overt acts in furtherance of its purpose and a common design to effect the unlawful result. The time when a conspiracy terminates depends on the particular facts and purposes of the conspiracy, and no general rule of law can accurately be laid down as to when the conspiracy is at an end. 15A C. J. S. Conspiracy § 35(2). If Brown had died on January 28 it would not necessarily follow that the conspiracy involving Mikell and Venning was ended. In like fashion, it cannot be argued that the conspiracy ended on January 28 because Venning discontinued his pursuit of the common design. After January 28 Mikell retained the $300 he had been paid and went to the office of the solicitor's investigator in an effort to consummate his part of the scheme. Evidence shows that Mikell talked to West about the case on January 30, February 12 and February 25.

A conspiracy involves a wicked state of mind. Neither defendant testified and neither defendant offered evidence. There is abundant evidence that a conspiracy came into being. There is no evidence that the wicked state of mind changed or that the conspiracy ended insofar as Brown or Mikell are concerned. Having held that the conspiracy as to these two defendants continued after January 28, we conclude that the statements of Brown as included on the tapes were admissible against Mikell, and that the statements of Mikell on the tapes were admissible against Brown.

Both appellants seek comfort in the case of *Bruton v. United States,* 391 U. S. 123, 88 S. Ct. 1620, 20 L. Ed. (2d) 476 (1968). They argue that the statement of one conspirator relative to the conduct and statement of the other conspirator is prejudicial and should not be submitted to the jury. They contend that separate trials should have been granted, and that the statement of a conspirator should be considered against that conspirator alone. We disagree. Bruton did not involve the law of conspiracy. It concerned the law of confrontation, but not the recognized exceptions to the hearsay rule. Reliance thereon is misplaced. Bruton does not apply to the facts herein.

See the more recent case of *Dutton v. Evans,* 400 U. S. 74, 91 S. Ct. 210, 27 L. Ed. (2d) 213 (1970). It relates to recognized exceptions to the hearsay rule, and held that the right to confrontation granted by the sixth amendment was not violated under facts similar to those now before us.

Section 1-65 of the 1962 Code provides as follows:

"Public employee taking statement in investigation to give copy.—Whenever any person employed by the State, or any county, city or municipality thereof, or any part of any such governing body, shall take a written statement in any investigation of any kind or nature from any person, the person receiving or taking the written statement shall give to the person making the statement a copy thereof and shall obtain from the person making the statement a signed receipt for the copy so delivered."

We quote Section 26-7.1 :

"Examination of witness in criminal proceeding concerning written statement made to, public employee.—No witness in any preliminary hearing or in any criminal judicial proceeding of any kind or nature shall be examined or cross-examined by any examiner, solicitor, lawyer or prosecuting officer concerning a written statement formerly made and given to any person employed by this State, or any county, city or municipality thereof, or any part of any such governing body, unless it first be shown that at the time of the making of the statement the witness was given an exact copy of the statement, and that before his examination or cross-examination the witness was given a copy of the statement and allowed a reasonable time in which to read it."

The legislature has not made the same rule applicable to recordings. One of the purposes of this statute is to permit a witness or a defendant to, refresh his memory relative to statements made prior to the trial. Inasmuch as the tapes were played to and for these defendants prior to the trial, it cannot be forcefully argued that the spirit and purpose of the rule has been circumvented.

All of the arguments which counsel submits as reasons for suppressing the tapes are without appeal, and we hold that the trial judge properly admitted the tapes in evidence.

The last exceptions relate to the judge's charge of the law to the jury. Counsel for the defendants requested the judge to charge as follows :

"Crime charged in Indictment

"In considering your verdict, you must not consider the guilt or innocence of the Defendants in any other crime except the crimes charged against them in the Indictment.

"Evidence of any untruths or misrepresentations committed by any one of the Defendants, although morally or ethically wrong, and which may have actually mislead another person or defrauded him, has nothing to do, with the crime charged in the Indictment and cannot be considered

by you on the question of the Defendants' guilt or innocence of the crimes charged herein."

The request to charge was patently improper. An analysis of the second paragraph reveals that defense counsel asked the judge to tell the jury that "Evidence of untruths and misrepresentations . . . has nothing to do with the crime charged . . . and cannot be considered . . . on the question of the defendants' guilt or innocence . . . ." This is not a sound proposition of law; the jury had a right and a duty to consider the evidence offered.

In lieu of the requested charge the judge said to the jury:

"You should determine the question of innocence or guilt of the crime charged which is conspiracy in this indictment, solely by testimony you've heard from witnesses under oath in this case. The fact that the defendant has been convicted on a prior occasion does not determine his guilt or innocence in this particular case."

At the conclusion of the charge the judge invited counsel to object to the charges made. At that time defense counsel objected to the charge we have just quoted. Brown had previous convictions; Mikell did not. It seems clear that the Judge understandably misinterpreted the purpose of the requested charge. The judge gained the impression that it had been intimated in the evidence that Brown had previously been convicted of running a lottery. In the charge he gave he was attempting to tell the jury that previous convictions should not be considered in determining this case. Unfortunately, this was not what counsel had in mind. In essence, counsel wanted the judge to tell the jury that if Brown and Mikell merely wanted to shake Venning down for money, there could be no conviction under the indictment as drawn. The point which defense counsel was attempting to make in the request to charge was not clearly spelled out, and it is understandable that the judge did not see the point when one realizes that the indictment itself stated that Venning as well as Brown and Mikell were conspirators. Mikell's con-

duct in pursuing the matter with the solicitor's investigator as late as February 25 clearly negates the idea that Brown and Mikell intended to shake Venning down and stop there. If the charge was erroneous, and if it may be attributed to the judge's misunderstanding of what defense counsel was driving at, we are of the opinion that the same was corrected when he called the jury back to the courtroom and gave them a supplemental charge as follows:

"Mr. Foreman and ladies and gentlemen of the jury, I previously instructed you that you should determine the question of the innocence or the guilt of these—each of these defendants of the crimes charged in this indictment solely on the basis of the sworn testimony which you've heard in this court room.

"I charge you further, that there is no evidence that either of the defendants in this trial have been convicted on any prior occasion."

The final contention of the defendants alleges error on the part of the trial judge in refusing their second request to charge. It reads as follows:

"Accomplices and co-conspirators

"The testimony of an accomplice or co-conspirator is testimony from a tainted source.

"The testimony of an accomplice or co-conspirator must be weighed with great care and be scrutinized closely, carefully and cautiously. This testimony, which is subject to great suspicion, must be viewed with distrust and acted on only after due and careful deliberation.

"The motives of an accomplice or co-conspirators in testifying and the circumstances under which his testimony is given, should be considered in determining how much weight and credibility his testimony should be given.

"In determining the weight and consideration of the testimony of an accomplice or co-conspirator, you must consider whether there has been any promise to him or indication of

favorable treatment for him, or actual benefit conferred, promised or indicated by the circumstances of the case."

The judge discussed this requested charge with counsel before he commenced his charge to the jury. The judge refused the charge saying:

"It seems to me this is a statement by the court on the facts, which is not the law in this state. I would be telling the jury the testimony of an accomplice or a co-conspirator is tainted testimony. I don't think I can do that. I don't think I can comment on the facts, nor do I think I'm free to comment as you ask me to do in the additional three paragraphs in request number two. You'll be able to argue these facts to the jury and the credibility of the witnesses is, of course, up to the jury and not the court."

We agree with the trial judge that the charge was on the facts; to give the requested charge would have invaded the province of the jury. The defendants were not entitled to a charge so favorable to them. There was no error in refusing the request.

We cannot agree that the trial was not fair. A perfect trial is not required. The predicament in which the defendants find themselves is not the result of an unfair trial as alleged, but the result of the fact that they so conducted themselves that the jury concluded beyond a reasonable doubt that they conspired to commit an unlawful act. We agree.

Let the judgment of the lower court be

Affirmed.

Moss, C. J., and Lewis, Bussey and Brailsford, JJ., concur.